**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

<table>
<tr><td>SOULEYMANE ALI,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>Movant,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td>Case. No. 2:12-cv-02159-JPM-cgc</td></tr>
<tr><td>v.</td><td>)</td><td>Case No. 2:10-cr-20152-JPM</td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>UNITED STATES OF AMERICA,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>Respondent.</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
</table>

**ORDER DENYING MOTION PURSUANT TO 28 U.S.C. § 2255**
**DENYING CERTIFICATE OF APPEALABILITY**
**CERTIFYING APPEAL WOULD NOT BE TAKEN IN GOOD FAITH**
**AND**
**DENYING LEAVE TO PROCEED *IN FORMA PAUPERIS* ON APPEAL**

Before the Court is the Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct

Sentence by Person in Federal Custody ("§ 2255 Motion") filed by Movant, Souleymane Ali,

Bureau of Prisons register number 23651-076, an inmate at the McRae Correctional Facility in

McRae, Georgia.   (§ 2255 Mot., *Ali v. United States*, No. 2:12-cv-02159-JPM-cgc (W.D. Tenn.),

ECF No. 1.)   For the reasons stated below, the Court DENIES Movant's § 2255 Motion.


I.     **BACKGROUND**

A.   **Case Number 10-20152**

On April 6, 2010, a federal grand jury returned a single-count indictment against Ali,

charging Movant with social security fraud, in violation of 42 U.S.C. § 408(a)(7)(A).

(Indictment, Criminal ("Cr.") ECF No. 1.)

The factual basis for these charges is stated in the presentence report ("PSR"):

6.      According to the investigative file, on August 6, 2009, a confidential informant (CI) provided information to the United States Secret Service regarding **Souleymane Ali.** According to the CI, **Ali** had the ability to obtain genuine U.S. Treasury checks.

7.      On August 6, 2009, acting under the control of Secret Service agents, the CI placed a monitored telephone call to **Ali** in which he arranged to meet with Ali and receive a U.S. Treasury check. On August 12, 2009, the CI placed three additional monitored calls attempting to meet with **Ali** but these attempts were not successful. On August 20, 2009, the CI placed two monitored calls to **Ali** and arranged to meet **Ali** at Kroger on Hickory Hill Road, Memphis to receive a U.S. Treasury check. The CI subsequently met with **Ali** and obtained a Treasury check valued at $1,313.10. The check was addressed to Angelo Verdini, Jr. of Monroe, New York. The CI and **Ali** agreed the CI would cash the check, keep 25% of the proceeds, and give the remaining 75% to **Ali.** During this monitored transaction, **Ali** told the CI he was a "middle man" and was able to obtain multiple checks each month totaling approximately $40,000 per month.

8.      In addition, on August 20, 2009, **Ali** was stopped by a Shelby County Sheriff Deputy due to a cracked windshield.  A registration query showed that the vehicle driven by **Ali** was registered to Stephen Nicholas. **Ali** provided a Tennessee driver's license in his own name and stated Stephen Nicholas was his cousin.

9.      On August 21, 2009, Secret Service agents determined **Ali** had two Tennessee driver's licenses, one in his own name and one in the name of Stephen Nicholas.

10.     Further investigation revealed that **Ali** first obtained a Tennessee's driver's license in the name of Stephen Nicholas, using social security number 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, on October 13, 2000.  This license was renewed on December 7, 2000; April l0, 2001; November 19, 2003; January 24, 2008; and July 22, 2008.   **Ali** obtained a Tennessee temporary state identification card in his own name, using his own social security number, on October 8, 2008 and a Tennessee driver's license also in his own name and social security number, on October 24, 2008. This license was renewed on September 1, 2009.

11.     According to investigating agents, the defendant stated Stephen Nicholas is his cousin who no longer resides in the United States. Agents were able to determine that the alias social security number used by the defendant is a genuine number, issued to a Stephen Nicholas, but they were not able to further identify or locate Mr. Nicholas.

12.　　On August 25, 2009, the CI placed another monitored phone call to **Ali** requesting to meet at the same location so he could deliver **Ali's** proceeds from the check given to the CI on August 20, 2009. **Ali** met the CI at Kroger driving a vehicle registered to a rental car company. The CI entered **Ali's** vehicle and delivered $990. The CI then obtained two more Treasury checks from **Ali:** a check in the amount of $839 in the name of Domenica Esposito of Mamaroneck, New York and a check in the amount of $939 in the name of Samantha Lafalce of Hartsdale, New York. **Ali** and the CI made the same agreement as before in which the CI would cash the check and take 25% of the proceeds while **Ali** would get 75%. **Ali** stated that he received the checks from an individual in New York and that there were two individuals "in the office" where the checks originated.

13.　　On August 28, 2009, agents determined the defendant's activity was related to a stolen check conspiracy being investigated in New York. Investigators in New York opened their case in July 2008. They estimated approximately 30 subjects were involved and $1.6 millions dollars had been lost. A postal employee was suspected of pulling the checks from the mail sort.

14.　　On September 2, 2009, the CI placed a monitored call to **Ali** and arranged to meet **Ali** at Walmart on Winchester Road, Memphis. **Ali** arrived as a passenger in a car registered to a rental company. **Ali** entered the CI's vehicle and the CI gave him $1,335 as payment for the checks received on August 25, 2009. **Ali** stated he did not have any checks in his possession but would be able to deliver one later. The CI asked for checks with more current dates to which **Ali** responded he would have the following week. Soon after the CI and **Ali** parted, the CI placed a monitored call to **Ali** requesting they meet at BP on the corner of Poplar Avenue and Ridgeway Road, Memphis and proceeded to the meeting location. Agents followed **Ali** to 6088 Elk Grove Road, Memphis, where **Ali** exited the vehicle and entered the residence. A dark colored car left the residence a short time later but agents were unable to determine whether **Ali** occupied the vehicle. **Ali** later arrived at BP in a tan SUV. **Ali** entered the CI's vehicle and gave him a Treasury check in the amount of $1,197.60 in the name of Michael Lessinger of Hartsdale, New York.

15.　　On September 9, 2009, the CI again placed a monitored call to **Ali,** stated he was unable to cash the most recent Treasury check, and requested a different check.

16.　　On September 15, 2009, agents obtained permission to track phone calls to and from **Ali's** cell phone.

17. On September 16, 2009, the CI placed a monitored call to **Ali** to request more checks, but **Ali** stated he did not have any checks.

18. On October 5, 2009, Tarik Holmes admitted to stealing U.S. Treasury checks in New York. Holmes' number appeared in **Ali's** cell phone register on numerous occasions

19. On October 19, 2009, the CI attempted to contact **Ali** but his cell phone number was disconnected. The CI was able to reach **Ali** at an alternate number but was told **Ali** did not have any checks and may be traveling to Africa.

20. The total loss resulting from the checks the defendant gave the CI in this case is $4,288.70. Additionally, the defendant advised the CI he obtained checks totaling approximately $40,000 per month. Because it is not clear how long the defendant was involved in this offense, **$40,000** is used as a conservative estimate of the total loss.

(PSR ¶ 6-20.)

Pursuant to a written Plea Agreement, Ali appeared before Magistrate Judge Tu M. Pham, on November 17, 2010, to plead guilty to the sole count of the Indictment. (Min. Entry, Cr. ECF No. 34; Plea Agreement, Cr. ECF No. 37.) The Plea Agreement provided, in pertinent part, that "SOULEYMANE ALI agrees that this plea agreement constitutes the entire agreement between himself and the United States and that no threats have been made to induce him to plead guilty. By signing this document, SOULEYMANE ALI acknowledges that he has read this agreement, has discussed it with his attorney and understands it." (Plea Agreement 2, Cr. ECF No. 37.)

Pursuant to the investigation and analysis contained in the PSR, Ali received zero criminal history points and, thus, was placed in a criminal history category of I. (PSR ¶ 68.) With a total offense level of 12 and a criminal history category of I, Ali received a guideline imprisonment

range of 10-16 months. (*Id.*)[1]

At a hearing on March 17, 2011, the Court sentenced Ali to a term of imprisonment of eighteen months, three years supervised release, a $3,000.000 fine, and $100.00 special assessment. (Min. Entry, Cr. ECF No. 59.) The conditions of Ali's supervised release required that he had to comply with third-party risk notification; he could not apply for new credit charges without prior approval; he must comply with DNA collection; and he must file amended tax returns. (*Id.*) Ali was referred to Immigration and Customs Enforcement ("ICE") for deportation proceedings. (J. in a Criminal Case 2, Cr. ECF No. 60.) Judgment was entered on March 18, 2011. (*Id.*) Ali did not take a direct appeal, though he had the right to do so. (*See* Sentencing Hr'g Tr. 49, Cr. ECF No. 64.)

### B. Case Number 13-01229

On February 27, 2012, Ali filed his *pro se* § 2255 Motion, in which he presented the following issues:

1. "It was misconduct on the government to knowingly convict the defendant based on incorrect information." (§ 2255 Mot. PageID 5, ECF No. 1.)
2. "It was ineffective assistance of counsel for failing to highlight [the government's misconduct as to Claim 1]." (*Id.*)
3. "The prosecutor also insisted that the defendant's plea agreement supported all the elements of the offense. However, it was misconduct because they did not." (*Id.*)

---

[1]The 2010 edition of the *Guidelines Manual* was used to determine Ali's sentence. Pursuant to § 2B1.1 of the United States Sentencing Guidelines (U.S.S.G.), the base offense level is 6 for fraud and deceit. Ali received a six point enhancement for fraud and deceit loss that exceeded $30,000 but less than $70,000, pursuant to U.S.S.G. § 2B1.1(b)(1)(D); a two point enhancement for the unauthorized transfer or use of any means of identification unlawfully to produce or obtain any other means of identification, pursuant to U.S.S.G. § 2B1.1(b)(10)(C)(i); and a two point reduction for acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1. Ali's Total Offense Level was 12.

4. "Counsel was ineffective for failing to seek relief for the defendant, on grounds that the constitution bars a conviction beyond a reasonable doubt." (*Id*.)
5. "It was ineffective assistance of counsel, and misconduct on the government to take advantage of defendant's ignorance and convict me of a separate crime from what I agreed to." (*Id*. at 6.)
6. "Counsel's failure to properly object [to the relevant conduct improperly used to enhance the defendant's sentence] has led to an 18 month sentence, and possible deportation." (*Id*.)
7. "Relevant conduct [namely, the use of the treasury checks as evidence of relevant conduct] was used against the recommendations of the U.S.S.G." (*Id*. at 7.)
8. "Not only was it ineffective, the defendant's counsel took a prosecutorial approach against the defendant's best interest, and violated his 6th amendment right to counsel." (*Id*.)

On September 7, 2012, the Court directed the Government to respond to the § 2255 Motion. (Order Directing Gov't to Respond, ECF No. 3.) The Government filed a Motion for Extension of Time to Respond on September 26, 2012, requesting an additional sixty days to respond. (Gov't's Mot. for Ext. of Time, ECF No. 4.) On September 27, 2012, the Court granted the Government's Motion for Extension of Time. (Order Granting Gov't's Mot. for Ext. of Time, ECF No. 5.) On November 5, 2012, the Government filed its Response to the § 2255 Motion. (Response to § 2255 Mot., ECF No. 6.)

The Government argued the following:

1. The Assistant United States Attorney did not make the untrue assertions alleged by the Movant.
2. The United States correctly alleged the statutory elements sufficient to uphold the Movant's guilty plea.
3. The Movant waived the voluntariness of his guilty plea by not appealing his conviction.
4. The § 2255 Motion fails to establish that counsel's performance was ineffective.
5. Contrary to Movant's allegation that his counsel did not object to the conduct enhancements, his counsel did object to the relevant conduct adjustments.

## II.    THE LEGAL STANDARD

Pursuant to 28 U.S.C. § 2255(a),

[a] prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

"A prisoner seeking relief under 28 U.S.C. § 2255 must allege either (1) an error of constitutional magnitude; (2) a sentence imposed outside the statutory limits; or (3) an error of fact or law that was so fundamental as to render the entire proceeding invalid."  *Short v. United States*, 471 F.3d 686, 691 (6th Cir. 2006) (internal quotation marks omitted).

After a § 2255 motion is filed, it is reviewed by the Court and, "[i]f it plainly appears from the motion, any attached exhibits, and the record of prior proceedings that the moving party is not entitled to relief, the judge must dismiss the motion."  Rule 4(b), Rules Governing Section 2255 Proceedings for the United States District Courts ("§ 2255 Rules").  "If the motion is not dismissed, the judge must order the United States attorney to file an answer, motion, or other response within a fixed time, or to take other action the judge may order."  *Id.* The movant is entitled to reply to the Government's response.  Rule 5(d), § 2255 Rules.  The Court may also direct the parties to provide additional information relating to the motion.  Rule 7, § 2255 Rules.

"In reviewing a § 2255 motion in which a factual dispute arises, the habeas court must hold an evidentiary hearing to determine the truth of the petitioner's claims."  *Valentine v. United States,* 488 F.3d 325, 333 (6th Cir. 2007) (internal quotation marks omitted).  "[N]o hearing is required if the petitioner's allegations cannot be accepted as true because they are contradicted by

the record, inherently incredible, or conclusions rather than statements of fact." *Id.* (internal quotation marks omitted). Where the judge considering the § 2255 motion also presided over the criminal case, the judge may rely on his recollection of the prior case. *Blanton v. United States*, 94 F.3d 227, 235 (6th Cir. 1996); *see also Blackledge v. Allison*, 431 U.S. 63, 74 n.4 (1977) ("[A] motion under § 2255 is ordinarily presented to the judge who presided at the original conviction and sentencing of the prisoner. In some cases, the judge's recollection of the events at issue may enable him summarily to dismiss a § 2255 motion . . . ."). Movant has the burden of proving that he is entitled to relief by a preponderance of the evidence. *Pough v. United States*, 442 F.3d 959, 964 (6th Cir. 2006).

## III. ANALYSIS OF MOVANT'S CLAIMS

### A. Prosecutorial Misconduct

Ali asserts three claims of prosecutorial misconduct against the Government. Ali argues that the Government: (1) knowingly convicted him based on incorrect information; (2) failed to prove all the elements of his offense in his plea agreement; and (3) took advantage of his ignorance and convicted him of a separate crime other than Social Security fraud.

As to the first claim of prosecutorial misconduct, Ali argues that the Government based his social security fraud charge on "untrue assertions." (§ 2255 Mot. 5, ECF No. 1.) Specifically, he states:

> Incorrect statements were made by the investigator who mentioned that Mr. Ali personally presented false documents to the Social Security Administration (SSA), to obtain a false social security number. For that, I was charged with the 42 U.S.C.A. 408(a)(7)(A), obtaining social security number from SSA, based on false information with intent to defraud.

However, both the defendant and the prosecution established on record that the social security number was given to Mr. Ali by a man named Stephen Nicholas.

. . .

In order to satisfy the mens rea element of the offense, the investigator claimed that Mr. Souleymane Ali, and not Mr. Nicholas, provided the false information needed to obtain the social security number.  That was contrary to both the evidence and testimony, and further against the prosecutor's very own statements on the record.

(*Id.*)

The Government argues that it has "consistently stated that the underlying conduct for the indictment was that he renewed fraudulently obtained and renewed Tennessee Driver's License using the Social Security number of Stephen Nicholas." (Answer 10, ECF No. 6.)   The Government directs the Court to the change of plea hearing, in which the following exchange occurred between the Court and the parties:

| | |
|---|---|
| **MR. JONES**:[2] | The essence of what [Ali] is pleading guilty to is based on the affidavit included him obtaining a Tennessee driver's license in the name of somebody else, gaining a false Social Security number to use that driver's license when he already had a Social Security number, a lawful Social Security number issued by the government years ago that he had been using in his name. . . . |
| . . . . | |
| **THE COURT**: | You are charged with having this false driver's license under someone else's name and using someone else's Social Security number; is the correct, Mr. Coleman? |
| **MR. COLEMAN**:[3] | That's correct, your Honor. |

---

[2]Jeffrey Jones was Movant's attorney during all relevant proceedings in his criminal case.

[3]Stephen C. Parker was the Assistant United States Attorney ("AUSA") assigned to Movant's criminal case.   However, AUSA Brian Coleman stood in on behalf of AUSA Parker at the Change of Plea Hearing.

| **THE COURT**: | And that you knowingly and with intent to deceive used this Social Security number ending in 6953 as stated by the government.   So with that understanding, aside from the circumstances surrounding the car stop itself, is what Mr. Coleman just stated true and correct? |
|---|---|

. . .

| **THE DEFENDANT**: | That's correct. |
|---|---|

(Change of Plea Hr'g Tr. 38-39, Cr. ECF No. 67.)

As to the second claim of prosecutorial misconduct, Ali argues that the Government failed to prove all the elements of the offense of social security fraud.   Ali contends that the "government failed to meet it's burden of proof, for they neither know who the [Social Security] number belongs to, much less who improperly obtained the number." (§ 2255 Mot. 5, ECF No. 1.) The Government argues, as it does in the first claim, that Ali was not charged with fraudulently obtaining the Social Security number from the Social Security Administration. Instead, Ali was charged and pled guilty to having a fraudulent driver's license and using Stephen Nicholas' Social Security number to obtain that fraudulent driver's license.

As to the third claim of prosecutorial misconduct, Ali argues that the Government took advantage of his ignorance of the law and the English language and convicted him of a separate crime other than Social Security fraud. Specifically, Ali states that:

> The defendant's plea was for obtaining a driver's license with the social security number provided by Stephen Nicholas. . . . However, the government chose to charge the defendant with a more serious and entirely different charge for the driver's license fraud. Mr. Ali, being confused and unaware of what he was charged, signed the plea thinking it was for fraud on the driver's license. . . . This is inspite of the fact that the defendant had established that he was from a French speaking country, and English was his second language.

(§ 2255 Mot. 6, ECF No. 1.)

The Government argues that not only is Movant's argument meritless but also that the Movant waived the voluntariness of his guilty plea by not appealing his conviction. The Government also directs the Court to the change of plea hearing, in which the following exchange took place between the Court and the parties:

| | |
|---|---|
| **THE COURT**: | Can you understand the English language? |
| **THE DEFENDANT**: | Yes. |
| **THE COURT**: | What type of training - - have you had any courses or training in English? |
| **THE DEFENDANT**: | Yeah, I went to school, you know, to learn English. |
| . . . | |
| **THE COURT**: | Have you - - is English a language that you are fluent in? |
| **THE DEFENDANT**: | Right. I speak English at home with my kids. |
| **THE COURT**: | So you speak English regularly? |
| **THE DEFENDANT**: | Right. |
| **THE COURT**: | Do you have any - - are you able to read or write the English language? |
| **THE DEFENDANT**: | Yeah, I can read better than I can write. |
| . . . . | |
| **THE DEFENDANT**: | [S]ometimes you have some technical terms that I'm not familiar with, so I'll be having a little problem with that, but I can understand. |
| **THE COURT**: | Mr. Jones, I assume you've had many occasions to speak with Mr. Ali. |
| **MR. JONES**: | Yes, Your Honor, I have. |

| | |
|---|---|
| **THE COURT**: | Do you have any concerns whatsoever about Mr. Ali's ability to understand the substance of your conversations with him as well as to understand why he's here today and what he's about to do? |
| **MR. JONES**: | As he indicated, English is his second language. French was his first language. He's been in this country, as he indicated, for some 17 to 18 years. He is very fluent in English. Your Honor can detect of course - - and I guess the record can reflect that he has an accent. Since English is not his first language, he does have a French accent as he speaks English, but he's an intelligent man. He has a vast English vocabulary. He does on occasion ask me questions about a legal technical term, but that in and of itself I don't find it to be anything unusual because folks in the country who speak only English sometimes don't understand technical legal terms. But insofar as this record is concerned, I believe he's very fluent, and I believe he will understand these proceedings, and I think he would verify for the record that he's fluent in English. |
| **THE COURT**: | I think he's already said - - you are fluent in English? |
| **THE DEFENDANT**: | Yes, that's right. |
| **THE COURT**: | Very well. Let me just make sure that the record is clear. Do you need an interpreter for today? |
| **THE DEFENANT**: | I don't think so. |
| **THE COURT**: | Okay. Well, if at any point someone makes a statement or uses a word that you feel you don't understand, you need to let me know or let Mr. Jones know or somehow make us aware that you are having trouble understanding any words. . . . |

(Change of Plea Hr'g Tr. 6-9, ECF No. 67.)

To assert a successful claim of prosecutorial misconduct, Movant must show that the

Government's conduct was "'so egregious so as to render the entire trial fundamentally unfair.'"

*Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th. Cir. 1997) (internal citation omitted). The Movant must establish that the Government's misconduct was "so pronounced and persistent that it permeates the entire atmosphere of the trial." *Id.* (internal quotation and citations omitted). Ali has failed to satisfy this burden. Instead of successfully arguing claims of prosecutorial misconduct, it is evident that Ali is attempting to challenge his plea agreement and sentencing.

A § 2255 motion is not a substitute for a direct appeal. *Ray v. United States*, 721 F.3d 758, 761 (6th Cir. 2013). "[N]onconstitutional claims that could have been raised on appeal, but were not, may not be asserted in collateral proceedings." *Stone v. Powell*, 428 U.S. 465, 477 n.10, 96 S. Ct. 3037, 3044 n.10, 49 L. Ed. 2d 1067 (1976). "Defendants must assert their claims in the ordinary course of trial and direct appeal." *Grant v. United States*, 72 F.3d 503, 506 (6th Cir. 1996). This rule is not absolute:

> If claims have been forfeited by virtue of ineffective assistance of counsel, then relief under § 2255 would be available subject to the standard of Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). In those rare instances where the defaulted claim is of an error not ordinarily cognizable or constitutional error, but the error is committed in a context that is so positively outrageous as to indicate a "complete miscarriage of justice," . . . what is really being asserted is a violation of due process.

*Id.*

Even constitutional claims that could have been raised on direct appeal, but were not, will be barred by procedural default unless the defendant demonstrates cause and prejudice sufficient to excuse his failure to raise those claims previously. *El-Nobani v. United States*, 287 F.3d 417, 420 (6th Cir. 2002) (withdrawal of guilty plea); *Peveler v. United States*, 269 F.3d 693, 698-99 (6th Cir. 2001) (new Supreme Court decision issued during pendency of direct appeal); *Phillip v. United States*, 229 F.3d 550, 552 (6th Cir. 2000) (trial errors). Alternatively, a defendant may

obtain review of a procedurally defaulted claim by demonstrating his "actual innocence." *Bousley v. United States*, 523 U.S. 614, 622 (1998).

Ali's claims of prosecutorial misconduct cannot be raised in a § 2255 Motion, because they could have been addressed on direct appeal. Ali has not presented any evidence that demonstrates cause or prejudice sufficient to excuse his failure to raise these claims during his direct appeal. He does not assert actual innocence. Therefore, Ali's claims as to prosecutorial misconduct in his § 2255 Motion are without merit and are DISMISSED.

## B. Ineffective Assistance of Counsel

Ali asserts four claims of ineffective assistance of counsel in his § 2255 Motion. Ali argues that he was denied effective assistance of counsel because his counsel failed to: (1) argue the Government's prosecutorial misconduct in basing his social security fraud charge on untrue allegations; (2) argue prosecutorial misconduct when the Government failed to meet its burden of proof for the elements of the charged offense; (3) clarify the charges brought against him by the Government; and (4) object to the improper use of the treasury checks as relevant conduct to enhance his sentence.

As to the first claim of ineffective assistance of counsel, Ali argues that his attorney should have objected to the Government's use of the untrue allegations to charge Ali with presenting false documents to the Social Security Administration. Specifically, Ali states that "[a] proper objection [by counsel] would have shown that the defendant did not provide any information to the SSA, and [the] element of knowingly and willingly providing false information to the SSA, would not have been satisfied." (§ 2255 Mot. 5, ECF No. 1.)

As to the second claim of ineffective assistance of counsel, Ali argues that his counsel was

"ineffective for failing to seek relief for the defendant, on grounds that the constitution bars a conviction beyond a reasonable doubt." (*Id*.) Specifically, Ali contends that his attorney failed to object to the Government's prosecutorial misconduct in failing to meet its burden of proof in establishing the elements for the Social Security fraud offense.

As to the third claim of ineffective assistance of counsel, Ali argues that his attorney was ineffective because he took advantage of Ali's ignorance of the English language and legal technical terms and allowed the Government to convict Ali of a separate crime other than driver's license fraud. Specifically, Ali argues that, "[i]nstead of clarifying the elements of the charge to the defendant, his counsel informed him that if he did not plead, other charges would be brought against him." (*Id*. at 6.)

As to the fourth claim of ineffective assistance of counsel, Ali argues that his attorney failed to object to the Government's use of the treasury check fraud as relevant conduct to enhance his sentence. Specifically, Ali states that:

> Mr. Ali had a conversation with the CI where he jokingly mentioned that he could provide monthly checks in the amount of $40,000. But, in truth, that was an exaggeration, and Mr. Ali neither had the control as a middleman, nor access to any such exorbitant amounts. The informant tried several times to induce the defendant in to providing more checks, but there were no other checks to provide. . . . Despite the failed attempts to entrap the defendant in to further criminal behavior, the prosecution chose to sentence the defendant with the intended loss for $40,000, simply because he mentioned that amount, and without any evidence of actual intended loss in that amount. Without the relevant conduct enhancements, the defendant would have been facing a 6 month sentence, and no deportation.

(*Id*.)

Ali further explains that the relevant conduct of the treasury check fraud was used against the recommendations of the *Guidelines Manual*. Ali argues that:

> The guidelines indicate that relevant conduct relates to circumstances that occurred during the commission of the convicted offense, in relation to the convicted offense, and in furtherance of the offense. The checks were used as evidence of relevant conduct, however they were misapplied. . . . The convicted offense occurred years prior to the checks, and the checks were not in furtherance of the convicted offense.
>
> . . .
>
> The defendant raised an objection to his counsel, but his counsel instead informed the court that there was no doubt that the checks fraud occurred during the commission of the social security number fraud. . . .

(*Id*. at 7.)

The Government denies all of Ali's claims of ineffective assistance of counsel. First, the Government argues, as it did against the claims of prosecutorial misconduct, that Ali waived any claim he had against the involuntariness of his plea agreement when he failed to file a notice of appeal. (*See* Answer 11-13, ECF No. 6.) Even if the Court were to examine the voluntariness of Ali's plea agreement, the Government argues that the record establishes that Ali executed a knowing and voluntary plea agreement. Ali signed the Plea Agreement, which stated that it was entered into voluntarily and without inducement to plead guilty. (*See generally* Plea Agreement, Cr. ECF No. 37.)

During the change of plea hearing, the following exchange occurred between Ali and the Court:

| | |
|---|---|
| **THE COURT**: | Mr. Ali, have you seen a copy of the indictment pending against you, in other words, the written charges made against you in this case? And I'm holding up here right in front of you the one-page, single-count indictment in the matter of the United States versus Ali; do you see this? |
| **THE DEFENDANT**: | Yes. |

| | |
|---|---|
| **THE COURT**: | Have you received this indictment? |
| **THE DEFENDANT**: | Yes. |
| **THE COURT**: | Have you gone over this indictment with Mr. Jones? |
| **THE DEFENDANT**: | Yes. |
| **THE COURT**: | Have you fully discussed the nature of your case and entire case with your lawyer? |
| **THE DEFENDANT**: | Yes. |
| **THE COURT**: | Have you had adequate time to discuss these charges with your lawyer? |
| **THE DEFENDANT**: | Yes, |
| **THE COURT**: | Are you fully satisfied with your lawyer's representation and advice given to you in this case? |
| **THE DEFENDANT**: | Yes. |
| . . . | |
| **THE COURT**: | Mr. Ali, you heard what the prosecutor just stated what the terms of the plea agreement are. Is that your understanding of the plea agreement in this case? |
| **THE DEFENDANT**: | Yes. |
| . . . | |
| **THE COURT**: | Has anyone attempted to force you to plead guilty today? |
| **THE DEFENDANT**: | No. |
| **THE COURT**: | Other than the plea agreement as we discussed, has anyone made any promises or agreement in exchange for your guilty plea? |
| **THE DEFENDANT**: | No. |

**THE COURT**:             Are you pleading guilty of your own free will because you are in fact guilty?

**THE DEFENDANT**:        Yes.

(Change of Plea Hr'g Tr. 10-11, 31, 35, Cr. ECF No. 67.)

Second, the Government argues that Ali fails to establish that his attorney's performance was deficient or prejudicial. Specifically, the Government stated that:

> When faced with fact that the government had the tape [of the defendant telling the CI that he could obtain approximately $40,000 per month in stolen checks] and corroborating evidence [that the defendant had actually delivered over $4,200 dollars in stolen checks between August 6, 2009 and September 2, 2009; and that the co-conspirators had actually stolen approximately $1.6 million dollars in checks to date] coupled with the fact that the defendant bore the burden of proof and could only proffer the uncorroborated testimony of defendant who had the ultimate motivation to fabricate, petitioner's counsel wisely chose not to challenge this guideline calculation. This conduct can hardly be said to be constitutionally deficient.

(Answer 16-17, ECF No. 6.)

Third, the Government argues that, contrary to Ali's allegations, his attorney did object to the relevant conduct adjustment before and during sentencing. The Government directs the Court to the "Position Regarding the Presentence Report" (Cr. ECF No. 58) filed by Ali, the objections made on the record by Ali's attorney during the sentencing hearing, and the affidavit of Ali's attorney, Jeffrey Jones (ECF No. 6-1). In Ali's response to the PSR, Ali's attorney challenged paragraphs 6-8, 12-20, and 26 of the PSR. (Defendant's Position Regarding PSR 1, ECF No, 58.) In paragraphs 6-8 and 12-20, the PSR details Ali's encounters with the CI regarding the stolen treasury checks and provides evidence of treasury check fraud. In paragraph 26, the PSR calculates a six point enhancement for the loss of more than $30,000 but less than $70,000 because of the stolen checks.

Ali's attorney provided the following objections to these paragraphs in the PSR:

(a) The Defendant is unable to understand how the facts contained in these paragraphs constitutes "relevant conduct" as such is defined in the Federal Sentencing Guidelines. It is acknowledged by the Defendant that the factual predicate set forth in these paragraphs is generally correct. It is undeniable that the treasury checks fraud occurred during the commission of the Social Security number fraud, but it is difficult to understand how the treasury check fraud and the social security fraud are related.

. . .

(b) The Defendant received a total of seven (7) checks from Mr. Musa. Five of the seven checks were given to the CI. The total value of these five checks was $4,288.70, as indicated in the [PSR]. . . .

. . .

The Defendant does acknowledge that he bragged to the CI that he could get $40,000.00 per month in checks, if the CI were able to pass them. The Defendant maintains that these statements were boasting and nothing else. . . . Indeed, as Paragraph 17 of the [PSR] indicates, the CI later asked the Defendant to provide him with additional checks, but the Defendant told him that he had no more checks. . . .

(Defendant's Position Regarding PSR 1-4, ECF No. 58.) Ali's attorney further challenged the six point enhancement to the Ali's offense level by arguing that the restitution should be "consistent with his actions and not his words." (*Id*. at 5.)

During the sentencing hearing, the following exchange, regarding the treasury check fraud as relevant conduct, occurred between the Court and the parties:

**MR. PARKER:** Actually, there's one other factor, and nothing on Mr. Jones at all. During plea negotiations, part of the plea negotiations were that we would not charge the second offense, the check offense, and that we intended to use this as relevant conduct, and I think after the fact, the defendant has decided otherwise. Now, I think Mr. Jones, we talked about it, and he's fully aware of it, and I'm not trying to revoke the plea agreement or anything else, but the bottom line is

19

however the court comes down on this issue, whether for or against when we get to the guideline range, that's something that should be considered because he's not being charged with the checks, because that would have been an additional three criminal history points or he would have to have been grouped or something like that.

**MR. JONES:** And I do agree with that observation, and in fact, Mr. Ali was involved with that discussion, as I recall, with Mr. Parker. We all three discussed those considerations at the time.

**THE COURT**: Right. Relevant conduct is discussed in 1B1.3, and it is also discussed in the second addendum to the presentence report. Under 1B1.3(a)(1)(A), it is provided that: Unless otherwise specified, (i) the base offense level where the guidelines specifies more than one base offense level, (ii), specific offense characteristics and, (iii), cross references in Chapter Two, and (iv), adjustments in Chapter Three, shall be determined on the basis of the following: (1)(A), all acts and omissions committed, aided abetted, counseled, commanded, induced, procured or willfully caused by the defendant; and then, of course, it says and (B), in the case of a jointly undertaken criminal activity, (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense.

The officer in connection with preparing these matters has indicated that, of course, in Chapter Three --and I have already read that portion really -- the basis for determining the conduct that is relevant in the case is all acts and omissions -- all acts and omissions committed, aided, abetted, counseled, induced, procured or willfully caused by the defendant.

Now, in this case, the government simply recited the facts in connection with what occurred. And what occurred in the case was that the defendant was, in fact, involved in the transfer of stolen Treasury checks, and the argument of the defense is that that is some - - in some way separate conduct. Would you tell me again, though, how it is because it occurred virtually simultaneous with everything else? I just want to make sure I have got that down because I can't quite figure this one out in terms of saying anything other than it's quite clear that under 1B1.3 it was an act willfully caused by the defendant. He did this, and it is being charged as relevant conduct in the case.

**MR. JONES:** If Your Honor reads my response carefully, I think Your Honor will note that I wasn't attempting as a lawyer to take a position that it wasn't on all fours relevant conduct. I believe what I was trying to do is express in explaining this to Mr. Ali and attempting to explain to him - -

**THE COURT:** Right, and you did express - - maybe you're saying this: That you went to this issue of the defendant is unable to understand how the facts contained in these paragraphs constitute relevant conduct as such is defined in the Federal Sentencing Guidelines. I think it was a matter of understanding as opposed to whether or not it is, in fact, properly considered as relevant conduct.

**MR. JONES:** That's correct.

. . .

**THE COURT**: The situation is that this check scam would all be part of the relevant conduct in the case. While you're charged in this case with Social Security violation, it is all related activity. It may not have been exactly the same thing, but it doesn't have to be. It certainly happened at the same time, so it is the same event, the same series of factual occurrences in which this occurred. So under the applicable guideline range and under the applicable guideline

> instruction under 1B1.3, this is a case where it is
> appropriate to consider this conduct. I think your
> counsel was careful in saying what he said, which is
> there was an issue perhaps of understanding why that
> would be the case, but the government has explained
> thoroughly the factual background in the case.
> Your counsel has carefully articulated an appropriate
> position. There was an issue about understanding
> what was happening, and there's really no dispute
> that we can consider this conduct. So we're going to
> have to overrule the objection and proceed with the
> presentence report as prepared.

(Sentencing Hr'g Tr. 9-11, 14-15, ECF No. 64.)

Last, in Jeffrey Jones' Affidavit, he states that "[t]he record will reflect that I attempted to

defend and argue against the use of the Treasury check fraud as relevant conduct." (Jeffrey Jones

Aff. ¶ 9, ECF No. 6-1.) The Government argues that these three documents in the record

demonstrate that Ali's ineffective assistance of counsel claims are without merit.

A claim that ineffective assistance of counsel has deprived a movant of his Sixth Amendment right

to counsel is controlled by the standards stated in *Strickland v. Washington*, 466 U.S. 668 (1984).

To demonstrate deficient performance by counsel, a petitioner must demonstrate that "counsel's

representation fell below an objective standard of reasonableness." *Id.* at 688. "A court

considering a claim of ineffective assistance must apply a strong presumption that counsel's

representation was within the wide range of reasonable professional assistance." *Harrington v.

Richter*, 562 U.S. 86, 104 (2011). The challenger's burden is to show that counsel made errors so

serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth

Amendment." *Id.* To demonstrate prejudice, a prisoner must establish "a reasonable probability

that, but for counsel's unprofessional errors, the result of the proceeding would have been

different." *Strickland*, 466 U.S. at 694.[4]  "A reasonable probability is a probability sufficient to

undermine confidence in the outcome." *Id.*  "It is not enough to show that the errors had some

conceivable effect on the outcome of the proceeding.  Counsel's errors must be so serious as to

deprive the defendant of a fair trial, a trial whose result is reliable."  *Richter*, 131 S. Ct. at 787-88

(internal quotation marks and citations omitted); *see also id.* at 791-72 ("In assessing prejudice

under *Strickland*, the question is not whether a court can be certain counsel's performance had no

effect on the outcome or whether it is possible a reasonable doubt might have been established if

counsel acted differently. . . .  The likelihood of a different result must be substantial, not just

conceivable.") (citations omitted).  Where, as here, a movant contends that his attorney rendered

ineffective assistance at a sentencing hearing, prejudice is established where a misapplication of

the Sentencing Guidelines increased a prisoner's sentence.  *See Glover v. United States*, 531 U.S.

198, 202-04 (2001).

"Surmounting *Strickland*'s high bar is never an easy task."  *Padilla v. Kentucky*, 559 U.S.

356, 371 (2010).

> An ineffective-assistance claim can function as a way to escape rules of waiver and
> forfeiture and raise issues not presented at trial, and so the *Strickland* standard must
> be applied with scrupulous care, lest "intrusive post-trial inquiry" threaten the
> integrity of the very adversary process the right to counsel is meant to serve.
> *Strickland*, 466 U.S., at 689-690, 104 S. Ct. 2052.  Even under *de novo* review, the
> standard for judging counsel's representation is a most deferential one.  Unlike a
> later reviewing court, the attorney observed the relevant proceedings, knew of
> materials outside the record, and interacted with the client, with opposing counsel,
> and with the judge.  It is "all too tempting" to "second-guess counsel's assistance
> after conviction or adverse sentence."  *Id.*, at 689, 104 S. Ct. 2052; *see also Bell v.
> Cone*, 535 U.S. 685, 702, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002); *Lockhart v.
> Fretwell*, 506 U.S. 364, 372, 113 S. Ct. 838, 122 L. Ed. 2d 180 (1993).  The

---

[4]"[A] court need not determine whether counsel's performance was deficient before
examining the prejudice suffered by the defendant."  *Id.* at 697.  If a reviewing court finds a lack
of prejudice, it need not determine whether, in fact, counsel's performance was deficient.  *Id.*

question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom. *Strickland*, 466 U.S., at 690, 104 S. Ct. 2052.

*Richter*, 131 S. Ct. at 788.

At issue here is whether Ali's attorney, Jeffrey Jones, rendered deficient and prejudicial performance as to his duties in representing Ali. After a review of all the relevant documents and hearings in the record, the Court finds the Government's arguments compelling. Ali has offered insufficient evidence to demonstrate that his attorney was deficient in his performance or that Ali was prejudiced by his attorney's representation. Additionally, Ali attempts to raise issues that should have been raised in his direct appeal, not his § 2255 Motion. Based on this analysis, Ali's claims of ineffective assistance of counsel are without merit and are DISMISSED. Judgment is entered in favor of Respondent.

## IV. APPEAL ISSUES

Under 28 U.S.C. § 2253, the district court is required to evaluate the appealability of its decision denying a § 2255 motion and to issue a certificate of appealability ("COA") "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. §§ 2253(a) & (c)(2); *see also* Fed. R. App. P. 22(b). No § 2255 movant may appeal without this certificate. *See* § 2253(c)(1)(B).

The COA must indicate the specific issue(s) that satisfy the required showing. 28 U.S.C. §§ 2253(c)(2) & (3). A "substantial showing" is made when the movant demonstrates that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (internal

quotation marks and citation omitted); *see also Henley v. Bell*, 308 F. App'x 989, 990 (6th Cir. 2009) (per curiam) (same). A COA does not require a showing that the appeal will succeed. *Miller-El*, 537 U.S. at 337; *Caldwell v. Lewis*, 414 F. App'x 809, 814-15 (6th Cir. 2011). Courts should not issue a COA as a matter of course. *Bradley v. Birkett*, 156 F. App'x 771, 773 (6th Cir. 2005).

In this case, for the reasons previously stated, the issues raised by the Movant lack substantive merit and, therefore, he cannot present a question of some substance about which reasonable jurists could differ. Accordingly, the Court DENIES a certificate of appealability. The Sixth Circuit has held that the Prison Litigation Reform Act of 1995, 28 U.S.C. §§ 1915(a)-(b), does not apply to appeals of orders denying § 2255 motions. *Kincade v. Sparkman*, 117 F.3d 949, 951 (6th Cir. 1997). Rather, to appeal *in forma pauperis* in a § 2255 case, and thereby avoid the appellate filing fee required by 28 U.S.C. §§ 1913 and 1917, the prisoner must obtain pauper status pursuant to Federal Rule of Appellate Procedure 24(a). *Kincade*, 117 F.3d at 952. Rule 24(a) provides that a party seeking pauper status on appeal must first file a motion in the district court, along with a supporting affidavit. Fed. R. App. P. 24(a)(1). However, Rule 24(a) also provides that if the district court certifies that an appeal would not be taken in good faith, or otherwise denies leave to appeal *in forma pauperis*, the prisoner must file his motion to proceed *in forma pauperis* in the appellate court. *See* Fed. R. App. P. 24(a) (4)-(5).

In this case, for the same reasons the Court denies a certificate of appealability, the Court determines that any appeal would not be taken in good faith. It is therefore CERTIFIED, pursuant to Federal Rule of Appellate Procedure 24(a), that any appeal in this matter would not be taken in

good faith. Leave to appeal *in forma pauperis* is DENIED.[5]

**IT IS SO ORDERED** this 27th day of April, 2015.


/s/ Jon P. McCalla
JON PHIPPS McCALLA
UNITED STATES DISTRICT JUDGE

---

[5]If Movant files a notice of appeal, he must also pay the full $505 appellate filing fee or file a motion to proceed *in forma pauperis* and supporting affidavit in the Sixth Circuit Court of Appeals within 30 days.